# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

January 3, 2012

No. 10-41205

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff-Appellee

v.

TONY HARRIS, also known as California Red;  LAKENDRICK MILLER, also known as Pee Wee,

Defendants-Appellants

Appeals from the United States District Court
for the Eastern District of Texas, Tyler Division

Before JONES, Chief Judge and DAVIS and DEMOSS, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

Defendants Tony Harris and Lakendrick Miller appeal their convictions on several counts of money laundering and conspiracy to commit money laundering principally on the basis that the evidence at trial was insufficient to establish that the proven transactions involved proceeds of specified unlawful activity, namely drug trafficking.  We agree and reverse.

I.

Defendants Tony Harris and Lakendrick Miller, along with five other individuals, were indicted by a grand jury on money laundering charges.  Harris was charged with one count of conspiracy to launder monetary instruments, in

No. 10-41205

violation of 18 U.S.C. § 1956(h), and six counts of money laundering and attempted money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i).[1] Miller was charged with one count of conspiracy to launder monetary instruments, in violation of 18 U.S.C. § 1956(h), and two counts of money laundering and attempted money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i). After a jury trial, the defendants were found guilty of all counts. In the forfeiture phase of the trial, the jury found that Harris and Miller had laundered $1.5 million in connection with the conspiracy. The jury also determined that five vehicles and approximately $18,000 in seized currency were involved in the offense.

Harris was sentenced to 293 months imprisonment and 3 years supervised release. Miller was sentenced to 252 months imprisonment and 3 years supervised release. The court entered judgments of forfeiture against both, which included a money judgment in the amount of $1.5 million.

Although no drug charges were brought, the government presented evidence that Harris, Miller and the other defendants were engaged in the sale

---

[1] § 1956. Laundering of monetary instruments

(a) (1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity--
. . .
    (B) knowing that the transaction is designed in whole or in part--
      (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; or
. . .
  shall be sentenced to a fine of not more than $ 500,000 or twice the value of the property involved in the transaction, whichever is greater, or imprisonment for not more than twenty years, or both. For purposes of this paragraph, a financial transaction shall be considered to be one involving the proceeds of specified unlawful activity if it is part of a set of parallel or dependent transactions, any one of which involves the proceeds of specified unlawful activity, and all of which are part of a single plan or arrangement.

18 U.S.C.S. § 1956.

No. 10-41205

and distribution of narcotics - mainly codeine cough syrup.  Harris obtained the drugs in California and shipped them to East Texas to Miller and others.  Miller and others in East Texas transmitted payments for the drugs from East Texas to Harris in California.

Between January 2007 and May 2009, over $2 million was moved from East Texas through Miller and his associates to Harris and his associates in California.  The fund transfers were made in two main ways  -

1.     Miller's group made cash deposits into the accounts of Harris, Harris's supplier and Harris's friend at a Bank of America branch in Dallas, Texas, which were then withdrawn by Harris or others at Bank of America locations in the Los Angeles area.

2.     Miller or other members in his group wired money to Harris or to Harris's associates using MoneyGram.

Almost all of the transactions were for amounts less than $10,000 so as to avoid federal bank reporting requirements.

Four of the other defendants indicted along with Harris and Miller pled guilty.  Charges against the remaining defendant were dismissed by the government.  Harris and Miller timely appealed.

## II.

Harris and Miller were found guilty of money laundering under 18 U.S.C. § 1956(a)(1)(B)(i) which punishes conducting or attempting to conduct a financial transaction which involves the proceeds of specified unlawful activity, knowing that the transaction is designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity.  Harris and Miller assert that the district court erred by denying their motions for judgment of acquittal.  They argue that the evidence presented by the government at trial was insufficient to establish that they conducted financial transactions with proceeds of specified unlawful

3

activity or that were designed to conceal.  We need not consider their arguments regarding concealment because we agree that the government failed to prove that the transactions involved proceeds of unlawful activity.

Because both defendants moved for judgment of acquittal on all counts at the close of the government's case and after the defense rested, this court reviews their claims for insufficient evidence *de novo*.  *United States v. Penaloza-Duarte*, 473 F.3d 575, 579 (5th Cir. 2006).  All evidence is reviewed in the light most favorable to the verdict to determine whether a rational trier of fact could have found that the evidence established their guilt beyond a reasonable doubt.  *Id.*

For their argument that the evidence was insufficient to establish that they conducted financial transactions with proceeds of specified unlawful activity, the defendants rely on *United States v. Gaytan*, 74 F.3d 545 (5th Cir. 1996) and *United States v. Dimeck*, 24 F.3d 1239 (10th Cir. 1994).

In *Gaytan*, Defendant Rene Gandara-Granillo and Jesse Macias-Munoz were leaders of a large cocaine operation based in El Paso, Texas.  Alfred Gaytan was a lower level operative who participated in several meetings involving drug transactions and  on at least one occasion stored and counted large quantities of cocaine at his residence.  Macias and Gandara challenged their convictions for money laundering under 18 U.S.C. § 1956(a)(1)(A)(I) which requires proof that a defendant conducted or attempted to conduct a financial transaction which he knew involved proceeds from unlawful activity with the intent to promote or further unlawful activity.  Macias and Gandara argued that there was insufficient evidence that they conducted a financial transaction, relying on *United States v. Puig-Infante*, 19 F.3d 929, 938 (5th Cir. 1994).  In *Puig-Infante*, this court defined when a transaction occurs (which is not an issue in this case), but also

observed that funds do not become the proceeds of drug trafficking until a sale of drugs is completed. Hence, a transaction to pay for illegal drugs is not money laundering, because the funds involved are not proceeds of an unlawful activity when the transaction occurs, but become so only after the transaction is completed.

*Gaytan*, 74 F.3d at 555-56, discussing *Puig-Infante*. This court reversed Macias's and Gandara's convictions on two counts. Under both counts, a third party owed Macias money for a drug debt. Macias sent others to retrieve it. The money did not become drug proceeds until received and there was no evidence that the courier obtained the money through illegal activity. Convictions on other counts were affirmed after this court rejected the defendants' contentions that no transaction took place.

In *United States v. Dimeck*, 24 F.3d 1239 (10th Cir. 1994), the defendant argued that "mere delivery of alleged drug-money by one courier to a second courier, who was to deliver the money to the seller of the drugs, does not constitute money laundering under 1956(a)(1)(B)(i)." *Id.* at 1241. The facts of the case involved physical delivery of cash by Dimeck (the first courier) to Moore (the second courier), who was to physically deliver the funds to the supplier. The Tenth Circuit stated that "Congress aimed the crime of money laundering at conduct that *follows in time* the underlying crime rather than to afford an alternative means of punishing the prior 'specified unlawful activity.'" *Id.* at 1244, quoting *United States v. Edgmon*, 952 F.2d 1206, 1213-14 (10th Cir. 1991)(emphasis added in *Dimeck)*. The court characterized the transaction in the case as one in which the seller wanted to receive the illegal proceeds as illegal funds. The use of Dimeck and the second courier were not to confuse anyone as to the character of the funds or to assist the funds to enter legitimate commerce. The courier's only role was to delivery the fund to the seller. Therefore, the court found no concealment. The case also discusses whether the delivery in question followed in time the completion of the underlying

No. 10-41205

transaction. It characterized the transaction as between a distributor getting drugs to his middlemen, who then sell the drugs, collect the money and pay the distributor for the drugs – similar to the facts of this case. *Dimeck* involved the final stage of the drug transaction - payment to the supplier. Even though the money was concealed for transport, the delivery of the payment was not money laundering. "The money laundering statute was designed to punish those drug dealers who thereafter take the additional step of attempting to legitimize their proceeds so that observers think their money is derived from legal enterprises." *Id.* at 1247, citing *Edgmon.*

*United States v. Puig-Infante*, 19 F.3d 929 (5th Cir. 1994), discussed in *Gaytan*, involved a marijuana ring operating between Mexico and Houston. The relevant facts from *Puig-Infante* involved two of the defendants in the case. One of the drivers for the ring testified that Jose and Abigail Puig requested that she accompany Abigail on a trip from Laredo to Florida where they were delivering a load of marijuana. Two buyers met them in Okeechobee, Florida, at a motel and gave Abigail $47,000 for the drugs. After the exchange, the driver and Abigail returned to Laredo with the cash. This court held that Abigail's transportation of the money received in exchange for the marijuana was not a financial transaction within the meaning of §1956. In response to the government's argument that the delivery and transfer of the cash from the buyers to Abigail in Florida and her subsequent movement of the funds interstate constitutes a financial transaction, this court stated that "the money did not become *proceeds* of unlawful activity until the sale of the marijuana was *completed*" upon delivery to Abigail. *Id.* at 939.

In the above cases, the money laundering convictions failed for two reasons - the transportation of funds was not a "transaction" within the meaning of §1956 and/or the funds transferred were not yet proceeds of specified unlawful activity because the funds themselves were payment for drugs and the unlawful

6

No. 10-41205

act was not yet complete.  Clearly in this case, we have "transactions" in the form of deposits and withdrawals and wire transfers.  See 18 U.S.C. § 1956 (c)(3) and (c)(4)(A).[2]  The question is whether the funds involved in those transactions were proceeds of unlawful activity.

The defendants argue that the drug transactions in this case were not completed and the funds did not become proceeds of unlawful activity until Miller paid Harris for the drugs received.  Therefore the financial transactions used to make this payment, i.e. the deposits and withdrawals and wire transfers that form the basis of the money laundering charges, did not involve proceeds of unlawful activity.  The government argued the case to the jury along those lines saying in opening argument -

> In any drug transaction there are drugs going one way and money coming back the other way. That's the nature of a drug transaction. Now, because drug transactions are illegal, they have to be concealed by those people who are participating in them. The people who are transporting and distributing the drugs have to conceal their actions.  Likewise, the people that are paying the money, transporting the money and distributing the money have to conceal their actions. That's the nature of drug transactions, that they have to be concealed from law enforcement, both the drugs and the money.

Based on the case law cited above, mere payment of the purchase price for drugs by whatever means (even by a financial transaction as defined in §1956) does not constitute money laundering.

---

[2]  18 U.S.C. § 1956(c)(3) states "the term 'transaction' includes a purchase, sale, loan, pledge, gift, transfer, delivery, ot other disposition, and with respect to a financial institution includes a deposit, withdrawal, transfer between accounts, exchange of currency, . . . . or any other payment, transfer, or delivery by, through, or to a financial institution by whatever means effected . . ."

18 U.S.C. § 1956(c)(4)(A) defines "financial transaction" as "a transaction which in any way or degree affects interstate or foreign commerce (i) involving the movement of funds by wire or other means or (ii) involving one or more monetary instruments . . ."

No. 10-41205

Our review of the trial transcript indicates that the government presented this case to the jury along the theory outlined in their opening statement. Evidence was presented regarding Harris's source for drugs in California, how he moved the drugs from California to East Texas to Miller and others and how Miller and others transferred funds in payment back to Harris in California using bank deposits and commercial wire services. In its closing argument, the government summarized the evidence that the funds transferred from Miller to Harris were drug proceeds by pointing to the testimony of three witnesses - Edson Frank Curtis, Timothy Taylor and Stephen Baker. Curtis and Taylor testified about the movement of drugs and money between Harris and Miller and their associates. Baker testified about gambling with Miller and losing and providing Miller with pill and codeine syrup. The testimony of these witnesses and other witnesses at trial simply showed that Harris supplied Miller and others with drugs and Miller and others sent payments in various forms back to Harris. These facts are simply not enough to meet the government's burden of showing that the funds transferred from Miller to Harris were proceeds of drug trafficking or anything other than payment of the purchase price for drugs. Money does not become proceeds of illegal activity until the unlawful activity is complete. The crime of money laundering is targeted at the activities that generally follow the unlawful activity in time. Considering the evidence in the light most favorable to the jury's verdict, the evidence is insufficient to support Harris's and Miller's convictions for money laundering.

## III.

For the foregoing reasons, the judgments of conviction are reversed and rendered and the defendants' sentences and judgments of forfeiture are vacated. REVERSED and RENDERED.